24100

Ex Parte ADOPTIVE PARENTS, Appellants/Respondents v. BIOLOGICAL PARENTS, and Charleston County Department of Social Services, Respondents, Intervenor/Respondent. In re BABY BOY W., Respondent/Appellant.

(446 S.E. (2d) 404)

Supreme Court

*Desa A. Ballard,* of *Ness, Motley, Loadholt, Richardson & Poole, P.A.,* Barnwell; and *Richard C. Bell,* Charleston, *for appellants/respondents Adoptive Parents.*

*Thomas P. Lowndes, Jr.,* Charleston, *for respondents Biological Parents.*

*Katrina L. Patton,* of Charleston, *guardian ad litem for appellant Baby Boy "W."*

*Tana G. Vanderbilt* and *N. Bruce Holland,* Columbia, *for intervenor/respondent South Carolina Dept. of Social Services.*

*Cameron B. Littlejohn, Jr.,* Columbia, *for amicus curiae, South Carolina Atty. Gen.*

*Susan L. Biro,* of *Scherr & Biro,* Washington, DC; *Dale Johnson,* of San Antonio, TX; and *James E. Thompson,* of Spartanburg, *for amicus curiae American Academy of Adoption.*

Heard Mar. 16, 1994.

Decided June 20, 1994.

TOAL, Justice:

This appeal arises from a family court order finding that "unusual and exceptional circumstances" were not present, pursuant to S.C. Code Ann. § 20-7-1670(e) (Supp. 1992), in an attempted adoption of a South Carolina infant by an out-of-state couple. We reverse and remand for a hearing *de novo.*

## FACTS

The potential adoptive parents (hereinafter, adoptive parents) are residents of the State of New York, while the biological parents were residents of South Carolina at the time of the child's birth.[1] The adoptive parents were specifically selected by the biological parents, and both sets of parents spent time together during at least the last two weeks of the pregnancy. There is also evidence that the adoptive parents were present in the delivery room and actually participated in the birth of the child. A home study in New York was completed prior to the birth of the child, and the results of the home study were presented to authorities in South Carolina.

On December 3, 1992, one day after the birth of the child, the adoptive parents filed a petition for adoption in the family court. A hearing was convened the following day to determine

---

[1] Shortly after the birth of the child, the biological parents became residents of the State of Tennessee.

the unusual or exceptional circumstances such as to justify placement of a South Carolina baby born with out-of-state proposed adoptive parents. Present at the hearing were the adoptive parents, the child, and their attorney who submitted the affidavits and consent forms of the biological parents. Because the biological parents were not in attendance, the presiding judge continued the hearing until the attorney for the adoptive parents was able to contact and bring the biological parents to court.[2] During this same time period, the South Carolina Interstate Compact Office on the Placement of Children coordinated with the New York Interstate Compact Office with each granting telephonic approval, on December 10, 1992, for the adoptive parents to return to New York.[3]

On December 11, 1992, the continued hearing was reconvened and the depositions of the biological parents were submitted to the court. At this same hearing, the family court appointed a *guardian ad litem* to represent the interests of the infant. The *guardian ad litem* recommended that the adoption be approved and the family court took the matter under advisement. On February 26, 1993, the family court issued its order finding that unusual or exceptional circumstances did not exist and requiring the adoptive parents to appear before the court on March 12, 1993 to show cause why the infant should not be turned over to the South Carolina Department of Social Services.

The biological parents filed affidavits showing that they intended to revoke their consents if the adoption was not permitted, and the adoptive parents and the child filed Motions for Reconsideration. Subsequently, the family court issued a second order requiring that the child be surrendered on March 12, 1993. The adoptive parents and the child filed the notice of appeal along with a petition for *supersedeas*. On March 12, 1993, an order was issued by a single Supreme

[2] At the hearing, the attorney for the adoptive parents produced depositions from the biological parents rather than have them present. The biological parents were in the process of moving to Tennessee for the father to obtain a new job; however, there is further evidence in the record that the biological father was also evading arrest and prosecution.

[3] This approval was later revoked in a letter dated April 7, 1993 from the South Carolina Department of Social Services to the attorney for the adoptive parents. SCDSS granted approval upon the representation by Attorney Bell that an Order for Unusual Circumstances would be forthcoming on December 11, 1992, since this did not occur, the approval was revoked.

Court Justice superseding the family court order which required the adoptive parents to surrender the child. This order for *supersedeas* directed that the child remain with the adoptive parents, pending the family court's final determination on the petition for adoption, and for counsel to be appointed to represent the biological parents.

In the afternoon of March 12, 1993, the family court held a hearing on the adoptive parents' and child's Motions for Reconsideration. After considering and then rejecting the inclusion of the Department of Social Services as a party, the family court denied the Motions for Reconsideration. The consolidated appeal of these family court orders is now before the Court.

## ISSUE

The main issue on appeal is whether the participation of prospective adoptive parents in the birth process, the subsequent parent/child bonding, and the express selection of the adoptive parents by the biological parents constitute unusual and exceptional circumstances which are sufficient to support an interstate adoption pursuant to S.C. Code Ann. § 20-7-1670(e) (Supp. 1992).

## LAW/ANALYSIS

### Background and the Adoption Process

The adoption process has undergone significant changes since the passage of the Adoption Act in 1986. S.C. Code Ann. §§ 20-7-1646 *et seq.* (Supp. 1993). Prior to 1986, South Carolina had the national reputation as a "baby selling" state. To eliminate this problem, the General Assembly established significant restrictions on adoptions by non residents. To illuminate the procedural posture of this case, we have included some of the more significant requirements of the Adoption Act.

Generally, the persons who may petition for adoption are South Carolina residents; however, some provisions for out-of-state residents are in place, particularly for special-needs children, relatives, where one adoptive parent is in military service, or where the child or family is subject to public notoriety. *See* S.C. Code Ann. § 20-7-1670 (Supp. 1993). This same statute also lists as an additional ground for allowing out-of-

state residents to adopt the existence of other "unusual or exceptional circumstances." *Id.* These circumstances are to be determined by the court and such hearing can occur either prior to birth or after birth upon a petition to the court. *Id.* The family court must address the unusual or exceptional circumstances before any potential out-of-state placement of the child can be completed. In addition, the family court must determine that the placement will be in compliance with the Interstate Compact on the Placement of Children which is codified at S.C. Code Ann. §§ 20-7-1980 *et. seq.* (Supp. 1993).

The petition for an Order of Unusual or Exceptional Circumstances which arose in this case should not be confused with the final hearing or the Final Order of Adoption. The petition for adoption must normally be filed within sixty days from the date the child is placed with the potential adoptive parents. *See* S.C. Code Ann. § 20-7-1730 (Supp. 1993). After the child is placed with the potential adoptive parents and the petition for adoption of unusual or exceptional circumstances is filed, temporary custody is vested in the potential adoptive parents. It is normally at this point that a finding is required for out-of-state adoptive parents. *See* S.C. Code Ann. § 20-7-1738 (Supp. 1993). The final hearing for adoption then takes place at a time which is no sooner than ninety days and no later than six months after filing the adoption petition. *See* S.C. Code Ann. § 20-7-1760 (Supp. 1993). This latter time period is modifiable based on special-needs children (twelve months) or in the discretion of the court for good cause shown. *Id.*

The posture of the present case is all in the pre-final adoption stage. The out-of-state residents, who are the potential adoptive parents, petitioned the family court for an Order of Unusual or Exceptional Circumstances which they thought was required for compliance with the Interstate Compact on the Placement of Children. At the present time, there has been no hearing on the final adoption because all of the proceedings in this matter have been held in abeyance pending the outcome of this appeal. It is against this procedural framework that our legal analysis must begin.

Unusual or Exceptional Circumstances

In deciding whether the participation of prospective adop-

tive parents in the birth process, the subsequent parent/child bonding,[4] and the express selection of the adoptive parents by the biological parents constitute unusual and exceptional circumstances which are sufficient to support an interstate adoption, we begin with the statutory language.

S.C. Code Ann. § 20-7-1647 (Supp. 1992), provides:

> [t]he purpose of this subarticle is to establish fair and reasonable procedures for the adoption of children and to provide for the well-being of the child, with full recognition of the interdependent needs and interests of the biological and the adoptive parents. However, when the interest of a child and an adult are in conflict, the conflict must be resolved in favor of the child. Children may be adopted by or placed for adoption with residents of South Carolina only, except in *unusual or exceptional circumstances*. [Emphasis added.]

The language "unusual or exceptional circumstances" appears again in S.C. Code Ann. § 20-7-1670 (Supp. 1992), which provides in relevant part:

> [a]ny South Carolina resident may petition the court to adopt a child. Placement of children for adoption . . . is limited to South Carolina residents with exceptions being made in the following circumstances only:

> \*   \*   \*   \*   \*   \*

> (e) there are *unusual or exceptional circumstances* such that the *best interests of the child* would be served by placement with or adoption by nonresidents of this State. [Emphasis added.]

The family court judge found that there was "no evidence that it was difficult to find a South Carolina couple willing to accept the health risks and possible expenses should there by any health problems of this infant."[5] [ROA at p. 4] The family court then concluded that there were

---

[4] The child, who was slightly older than 15 months when this case was heard on oral argument, has remained in the custody and care of the adoptive parents since two days after his birth on December 2, 1992.

[5] It is undisputed that the biological mother's family medical history demonstrated a potential for Down's Syndrome and/or heart disease in the child. This family medical history, coupled with the biological mother's docu-

no unusual or exceptional circumstances which would serve the best interest of the child, and that both the adoptive and biological parents were merely using South Carolina as a forum for an adoption which their home states would not allow.[6]

The adoptive parents, the child, and the biological parents all contend that this was an unconstitutional application of the unusual or exceptional circumstances standard. They argue that on their face, the statutes do not require that South Carolina couples be canvassed prior to the selection of an out-of-state couple as adoptive parents, and that the bonding between the adoptive parents and the child, the participation of the adoptive parents in the birth process, the selection of the adoptive parents by the biological parents, and the financial support for the biological parents' medical and living expenses are sufficient to establish that unusual or exceptional circumstances exist in this case. Generally, we agree.

The terms "unusual" or "exceptional" are not defined in the statute. A fairly recent law review article opined that "[n]o four words have provoked more confusion or disagreement at the adoption bar than 'unusual or exceptional circumstances.'" *South Carolina Adoption Law: Out of the Cradle into the Twenty-first Century*, 40 S.C. L. Rev. 770, 776 (1989). This same article points out the difficulty the adoption bar faces in obtaining a judicial finding of unusual or exceptional circumstances:

---

mented previous drug abuse, indicated that the pregnancy was high risk and that the child had a significant potential for birth defects. However, at the time of the family court's decision, the child had been delivered with no apparent birth defects or other health problems.

[6] In their brief, the Department of Social Services argues that the judgment of the lower court must be given deference and be disturbed only where there is an abuse of discretion. Both of the cases cited in their brief dealt with the discretionary decisions of a trial court in actions at law. *See Stanton v. Town of Pawleys Island,* — S.C. ,—, 420 S.E. (2d) 502 (1992) (appeal to the circuit court of an administrative action); *Coleman v. Dunlap,* 306 S.C. 491, 413 S.E. (2d) 15 (1992) (an action at law to interpret a will). Regardless of their assertion, adoptions are equitable proceedings, and therefore, the Court has jurisdiction to find facts in accordance with its view of the preponderance of the evidence. *See* 4 S.C. Juris. *Adoptions* § 6; *see also Rutherford v. Rutherford,* 307 S.C. 199, 414 S.E. (2d) 157 (1992); S.C. Const. art. V, § 5; S.C. Code Ann. § 14-3-320 (Supp. 1993) (as modified by this Court's holding in *Rutherford, supra*).

> [s]ome family court judges maintain that the legislature designed the Act to prevent interstate adoption entirely, and staunchly refuse to grant these adoptions under any circumstances. Other judges, routinely upon motion of the adoptive couple, find "unusual or exceptional circumstances" to exist. Unfortunately, but not unexpectedly, this dichotomy may prompt judge-shopping in some jurisdictions. The need for legislative or judicial definition of this language is obvious.

*Id.* at 777 [citations and footnotes omitted]. Moreover, the very facts of this case, as petitioned to the family court, were listed in the article as routinely satisfying the unusual or exceptional standard. *Id.* Because of the wide variance in opinion about the definition of the terms "unusual" or "exceptional," a conflict has developed in the interpretation of the current statutory scheme by our family court judges. Because of this conflict in interpreting the statute, we now take the opportunity to clarify the meaning of the terms "unusual or exceptional" in the context of potential out-of-state adoptive parents.

Where the legislature elects not to define a term in a statute, the courts will interpret the term in accord with its usual and customary meaning. *Bryant v. City of Charleston*, 295 S.C. 408, 368 S.E. (2d) 899 (1988). In construing a statute, a court may consider legislation which deals with the same subject matter. *Fidelity and Cas. Ins. Co. of New York v. Nationwide Ins. Co.*, 278 S.C. 332, 295 S.E. (2d) 783 (1982). Statutes in apparent conflict should be construed, if possible, to allow both to stand and give effect to each. *Higgins v. State*, 307 S.C. 446, 415 S.E. (2d) 799 (1992); *Chris J. Yahnis Coastal, Inc. v. Stroh Brewery Co.*, 295 S.C. 243, 368 S.E. (2d) 64 (1988).

To assist in finding an appropriate definition for unusual or exceptional circumstances, the adoptive parents point to the language of the Interstate Compact on the Placement of Children which is codified in S.C. Code Ann. §§ 20-7-1980 *et. seq.* (1985). The general purpose of this legislation is outlined in § 20-7-1980(1)(a) which provides in relevant part that:

> [i]t is the purpose and policy of the party states to cooper-

ate with each other in the interstate placement of children to the end that . . . [e]ach child requiring placement shall receive the maximum opportunity to be placed in a suitable environment and with persons or institutions having appropriate qualifications and facilities to provide a necessary and desirable degree and type of care.

Further, the adoptive parents note that the legislation in § 20-7-2040 specifically prohibits "legal restrictions on out-of-state placements made pursuant to the Interstate Compact on the Placement of Children." We agree with the adoptive parents when they argue that to allow a court to focus exclusively on the non-residence of the prospective parents would violate the provisions of § 20-7-2040.

To avoid this apparent conflict among the various statutes, the adoptive parents take the position that unusual or exceptional should turn on a "best interests of the child" standard. We agree. This position is supported in the language of § 20-7-1670(e) which requires that unusual or exceptional circumstances be "such that the best interests of the child would be served by placement with or adoption by nonresidents of this State . . .," and that the application of any other overriding criteria, especially on the basis of residency, would violate the Interstate Compact on the Placement of Children. Therefore, to read the statutes in *pari materia*, the standard must be narrowed to the best interests of the child.

On the present facts, the adoptive parents, the child, and the biological parents all assert that the best interests of the child were disregarded by the family court in its order finding that no unusual or exceptional circumstances were present. This may or may not be a true statement, since the present record has left us in the position of not being able to cogently review the family court's decision.

At the outset, it should be noted that the family court is only required to "include in its order specific findings of fact as to the circumstances allowing the placement of a child with a nonresident or the adoption of a child by a nonresident." S.C. Code Ann. § 20-7-1670 (Supp. 1993). There is no converse statutory mandate for the family court to make specific findings where there is no finding of unusual or exceptional circumstances; however, the better practice is for the

family court to specifically detail the reasons for the denial. The reference in the order to "no evidence that it was difficult to find a South Carolina couple willing to adopt," may or may not have been the basis for the family court's ruling; but because of this limited record, we are unable to review the family court's decision. The absence of specific findings is especially problematic on facts which present an almost paradigm example of circumstances which should be construed as meeting the unusual or exceptional circumstances standard.

Additional language found in the family court's first order indicates that perhaps the residency of the adoptive parents was not the sole grounds for the judge's order, yet an inquiry into the hidden circumstances behind an order is at best speculation. The family court made a specific finding that "[t]his Court concludes from all the evidence that the Birth Parents and the Adoptive Parents were brought together in South Carolina to use this state as a forum for adoption that their home states do not allow." [ROA at p. 5] This statement is troubling since it implies that both the adoptive and biological parents were trying in some manner to circumvent the adoption legislation which was intended to eliminate the sale of babies. *See* S.C. Code Ann. § 16-3-1060 (Supp. 1993) (sale of a child as a criminal felony); S.C. Code Ann. § 20-7-1690 (Supp. 1993) (prohibition against accepting compensation for consent or relinquishment in adoptions); *see* also *South Carolina Adoption Law: Out of the Cradle Into The Twenty-First Century*, 40 S.C. L. Rev. 770, 774 (1989). This latter inference from the order was not developed in the record which leaves us in the position of guessing about the answer to a very grave question.

The family court's order simply concludes, *sua sponte*, that the adoption was not maintainable in their respective home states. There is no record to support the family court's determination, and we are unable to ascertain whether this is the actual intent of the parties. In the family court order denying the Motions for Reconsideration, the family court sheds a little more light on the reasons for the previous holding. In his order dated May 7, 1993, the family court judge concluded that the *guardian ad litem's* recommendation was premised on minimal contact with the adoptive parents, and that the

guardian did not address the unusual or exceptional circumstances from the perspective of the best interest of the child. The family court judge further concluded that the previous South Carolina Department of Social Services' approval for placement of the child out of state was based on an apparent verbal misrepresentation of the adoptive parents' attorney, and that the prior approval in accordance with the Interstate Compact on the Placement of Children had been withdrawn. The judge noted that at the time of the hearing, nothing else was before the court except the statements of the adoptive parents and depositions of the biological parents; absolutely none of the actual parties to the adoption were present. Against this evidence, the family court concluded that the provisions of § 20-7-1670 regarding the Interstate Compact had not been completed. Unfortunately, on the limited facts before us, we have no way of confirming the family court's conclusions. Ordinarily a judicial finding of "failure of evidence" simply means that the party with the burden of proof loses. The judge is not required to detail the finding of a negative. Here, because of the conflict between family courts in interpreting "unusual" and "exceptional" and because the whole area is so confused, we have chosen to set guidelines and remand this matter for a *de novo* hearing.

We note that when out-of-state residents attempt to adopt a child, the statutes allow the family court to consider two competing interests. The first is the finding of unusual or exceptional circumstances which on the present facts present the paradigm example, and the second is the express[7] and implied[8] state policy against "baby selling." For the family court judge, a finding of "unusual" or "exceptional" circumstances may not end the inquiry. Even where unusual or exceptional circumstances are present, the family court could also determine that the adoption was contrived to circumvent our state policy against "baby selling." Where this situation arises, the family court judge must analyze the facts against the objective criteria established in S.C. Code Ann.

[7] *See* S.C. Code Ann. § 16-3-1060 (Supp. 1993) (sale of a child as a criminal felony); S.C. Code Ann. § 20-7-1690 (Supp. 1993) (compensation prohibition for parental consents or relinquishments).

[8] *See South Carolina Adoption Law: Out of the Cradle into the Twenty-first Century*, 40 S.C. L. Rev. 770 (1989).

§§ 16-3-1060 and 20-7-1690 (Supp. 1993) which would clearly preclude any placement or adoption.

We remind the litigants that it is well within the discretion of the family court to require the testimony of all relevant parties to determine whether the conditions for "unusual" or "exceptional" circumstances exist, and to examine, if necessary, the issue of whether the parties have engaged in the prohibited conduct of "baby selling." On remand, the family court judge may pursue these questions as he attempted to do previously and make specific findings in accordance with the pertinent law and evidence presented.

Accordingly, for the reasons stated, the family court is REVERSED and the matter is REMANDED for a hearing *de novo*.

CHANDLER, Acting C.J., FINNEY and MOORE, JJ., and Acting Associate Justice L. HENRY MCKELLAR, concur.